1   **KIMBERLY MAXSON-RUSHTON, ESQ.**
    **Nevada Bar No. 5065**
2   **R. SCOTT RASMUSSEN, ESQ.**
    **Nevada Bar No. 6100**
3   **COOPER LEVENSON, P.A.**
    **1835 Village Center Circle**
4   **Las Vegas, Nevada 89134**
    **T:  (702) 366-1125**
5   **F:  (702) 366-1857**
    **krushton@cooperlevenson.com**
6   **srasmussen@cooperlevenson.com**
    ***Attorneys for Plaintiffs***
7
    **and**
8
    **ALFRED J. BENNINGTON, JR., ESQ.**
9   **Florida Bar No. 404985**
    **(*Pro hac vice* to be filed)**
10  **GLENNYS ORTEGA RUBIN, ESQ.**
    **Florida Bar No. 556361**
11  **(*Pro hac vice* to be filed)**
    **SHUTTS & BOWEN LLP**
12  **300 South Orange Avenue, Suite 1000**
    **Orlando, Florida 32801**
13  **T:  (407) 835-6755**
    **F:  (407) 849-7255**
14  **bbennington@shutts.com**
    **grubin@shutts.com**
15  ***Attorneys for Plaintiffs***

16  **and**

17  **DANIEL J. BARSKY, ESQ.**
    **Florida Bar No. 25713**
18  **(*Pro hac vice* to be filed)**
    **SHUTTS & BOWEN LLP**
19  **200 South Biscayne Boulevard, Suite 4100**
    **Miami, Florida 33131**
20  **T:  (561) 650-8518**
    **F:  (561) 822-5527**
21  **dbarsky@shutts.com**
    ***Attorneys for Plaintiffs***

22

23

24          **IN THE UNITED STATES DISTRICT COURT**

            **FOR THE DISTRICT OF NEVADA**
25

26
    DIAMOND RESORTS INTERNATIONAL,   CASE NO:
27  INC., a Delaware corporation; DIAMOND
    RESORTS   CORPORATION,   a   Maryland
28  corporation,   DIAMOND   RESORTS   U.S.

                              1

COLLECTION DEVELOPMENT, LLC, a
Delaware limited liability company, and
DIAMOND RESORTS MANAGEMENT,
INC., an Arizona corporation,

          Plaintiffs,

vs.

REED HEIN & ASSOCIATES, LLC, a
Washington limited liability company, d/b/a
TIMESHARE EXIT TEAM; BRANDON
REED, an individual and citizen of the state of
Washington; TREVOR HEIN, an individual
and citizen of Canada; and SCOTT
LOUGHRAM, an individual and citizen of the
state of Washington,

          Defendants.

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, Plaintiffs, DIAMOND RESORTS INTERNATIONAL, INC., DIAMOND RESORTS CORPORATION, DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC, and DIAMOND RESORTS MANAGEMENT, INC. (collectively, "Plaintiffs" or "DIAMOND"), by and through its counsel of record KIMBERLY MAXSON-RUSHTON, ESQ. and R. SCOTT RASMUSSEN, ESQ. of the law firm COOPER LEVENSON, P.A. and hereby submits this Verified Complaint against Defendant, REED HEIN & ASSOCIATES, LLC, a Washington limited liability company d/b/a TIMESHARE EXIT TEAM ("TET"), BRANDON REED, TREVOR HEIN, and SCOTT LOUGHRAM, as individuals and hereby states as follows:

### Preliminary Allegations

**A.**    **Personal and Subject Matter Jurisdiction**

1.    This Court has subject matter jurisdiction over this dispute by virtue of 28 U.S.C. § 1332 in that there is complete diversity of citizenship between Plaintiffs and Defendant(s) in this matter and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000. Additionally, this Court has subject matter jurisdiction over the claims grounded in the Lanham Act by virtue of 28 U.S.C. § 1338(a).

2.     This Court has supplemental subject matter jurisdiction over the Nevada state law claims contained herein pursuant to 28 U.S.C. § 1367(a) as the state law claims are so related to clams in this action within the Court's original jurisdiction that they form part of the same case or controversy.

3.     This Court may exercise personal jurisdiction over Defendants because this action arises out of and is related to Defendants' purposeful contacts with the State of Nevada, including (i) the solicitation of Nevada owners through the use of false and deceptive advertising, (ii) the intentional interference with contracts between Plaintiffs, whose principal place of business is located in Nevada, and Nevada residents, and (iii) the intentional interference with advantageous business and contractual relationships between Plaintiffs and Nevada residents.   Specifically, Defendants solicited, via postings on various websites, national television endorsements, radio advertising, and other advertising, Diamond Owners (as that term is defined herein below) who are also Nevada residents (many of whom own timeshare interests in Nevada).   Through the false and deceptive advertisements, Defendants lure Diamond Owners (amongst others) to retain their services which underlie Plaintiffs' claims for tortious interference with contracts, tortious interference with advantageous business relationships, and violations of Nevada Revised Statute § 14.065.

4.     TET also executed agreements with Diamond Owners, many of whom are Nevada residents. TET was to perform the contracts, in whole or in part, in Nevada, in that they were to negotiate with Plaintiffs to secure the release of any future obligations owed to Plaintiffs, and the cancellation of the Diamond Owners' contracts with Plaintiffs. To affect the cancellation, Defendants caused letters to be mailed to Plaintiffs in Nevada.

5.     In addition, Defendants' internet-based operations subject them to personal jurisdiction in the state of Nevada. Defendants do not operate a passive advertising website; rather Defendants do business over the internet by entering into contracts with residents of Nevada through

the website, which involves the repeated transmission of computer files over the internet and allows Nevada residents to exchange their contact information with a host computer.  Defendants operate numerous websites, including, without limitation, www.timeshareexitteam.com, www.reedhein.com, and www.321exit.com, to solicit consumers.

6.     Upon information and belief, Reed, Hein, and Loughran have all directly participated in, and/or directed, the actions of TET as described herein below including, without limitation, TET's infringement of the Diamond Marks (as that term is defined herein below).

7.     The Court's exercise of personal jurisdiction over Defendants will not violate traditional notions of fair play and substantial justice.

**B.     Venue**

8.     Venue is proper in the District of Nevada pursuant to 28 U.S.C. §1391, because as described above and as set forth below, a substantial part of the events giving rise to Plaintiffs' claims occurred in Nevada, a substantial number of Plaintiffs' timeshare resort properties are located in this District, and Defendants' conduct giving rise to the claims set forth herein occurred in and/or caused damage to Plaintiffs in Nevada, making Defendants subject to this Court's personal jurisdiction.

**C.     The Parties**

**1.     The Plaintiffs**

9.     Plaintiff DIAMOND RESORTS INTERNATIONAL, INC. ("DRI") is a Delaware corporation with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  DRI consists of, amongst others, interests in vacation ownership resorts. DRI's indirect subsidiaries – including DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC ("US COLLECTION") – offer vacation ownership programs wherein members acquire vacation ownership interests in the form of points that owners can then use to stay at various destinations.  In sum, DRI is a holding company and its principal asset is the ownership of

4

equity interests in its direct and indirect subsidiaries, including those identified herein. DRI is the parent company of DIAMOND RESORTS HOLDINGS, LLC ("DRH").

10.     DRH is similarly a holding company and the parent company of DIAMOND RESORTS CORPORATION ("DRC").

11.     Plaintiff, DRC, is a Maryland corporation with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. DRC is the parent company or ultimate parent company of several entities that conduct timeshare sales, exchange, management, and development activities throughout the United States and worldwide. DRC and its subsidiaries develop, own, operate, and manage vacation membership resorts, and through resort and partner affiliations, provide members and guests with access to managed resorts, affiliated resorts and cruise itineraries. DRC is the 100% owner of multiple underlying DIAMOND development entities, each of which is registered in the states wherein they do business, such development entities providing timeshare interests in the form of deeded weeks or in the form of points. These development entities are the contracting party with DIAMOND timeshare owners to purchase agreements for deeded timeshare interests and/or timeshare interests in the form of points. As part of the purchase of the timeshare interest, owners are also required to pay maintenance fees and annual assessments. Because DRC is the 100% owner of the development entities it ultimately subsumes all the losses of its underlying development entities, and therefore, all of the damages, both current and future, as a result of litigation are encapsulated within DRC.

12.     Plaintiff US COLLECTION, as explained below, is an indirect wholly-owned subsidiary of DRI and direct subsidiary of DRC.

13.     Plaintiff US COLLECTION is a Delaware limited liability company with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. The sole member of US COLLECTION is Diamond Resorts Developer and Sales Holding Company, a

Delaware corporation with its principal place of business at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. US COLLECTION sells membership interests to consumers in the form of points, which, in turn, are exchanged for use of properties, including properties located in Nevada, in the Diamond Resorts US Collection, a non-specific multi-site timeshare plan. In addition to its sales functions, US COLLECTION may finance the purchase of membership interests for consumers.

14. US COLLECTION is the contracting party with Diamond timeshare owners to purchase agreements for timeshare interests in the form of points. As part of the purchase of the timeshare interest, owners are also required to pay maintenance fees and annual assessments.

15. US COLLECTION is registered to do business in Nevada and regularly transacts business in Nevada.

16. Plaintiff, DIAMOND RESORTS MANAGEMENT, INC. ("DIAMOND MANAGEMENT"), is another indirect subsidiary of DRI. DIAMOND MANAGEMENT is an Arizona corporation, registered to do business in the State of Florida, with its principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. By way of contractual agreement, the management powers of the various DIAMOND subsidiaries and affiliated entities have delegated their management powers and rights to this DIAMOND MANAGEMENT arm exclusively. The management services delegated to the management company includes, but is not limited to, the billing and collection of maintenance and annual fees from timeshare interests.

17. DIAMOND MANAGEMENT maintains rights and interests in the maintenance and annual fees which are impacted by Defendants' conduct. As such, DIAMOND MANAGEMENT is the real party in interest and has standing to prosecute the claims herein.

18. DIAMOND is a global leader in the hospitality and vacation ownership industries.

19. DIAMOND strives to provide innovations and flexibility to ensure that Diamond members and owners create their dream vacation, and strives to provide Diamond members and

6

owners an increased sense of happiness and satisfaction in their lives, while feeling healthier and more fulfilled in their relationships, by enjoying memorable and meaningful experiences.

20.     DIAMOND is concerned not only for its own economic well-being, but for the well-being of members and owners of DIAMOND timeshare interests ("Diamond Owners"), who have also been defrauded by Defendants' wrongful conduct.

21.     DIAMOND institutes this action to redress the Defendants' illegal actions and damages suffered by DIAMOND, and to deter future wrongful conduct against DIAMOND and Diamond Owners.

**2.     The Defendants**

22.     A cottage industry has arisen whereby unscrupulous companies mislead consumers, including Diamond Owners, into disrupting or otherwise breaching the valid, enforceable contracts between consumers and timeshare companies, including DIAMOND. Entities participating in this industry are known as "timeshare exit companies." Timeshare exit companies generally promote and market themselves as having the ability to get timeshare owners released or otherwise discharged from their contracts – including the attendant financial obligations – with timeshare developers, like DIAMOND. While engaging in this behavior, timeshare exit companies generally promote themselves as "consumer protection firms." At least some timeshare exit companies, including the defendant, fail to inform consumers that the consumers may suffer substantial harm to their finances and credit if they utilize the timeshare exit company's methods. Thus, at least some timeshare exit companies, including the defendant, trick consumers, who otherwise may not breach their timeshare contracts, into retaining the timeshare exit company to breach those contracts.

23.     Defendant, REED HEIN & ASSOCIATES, LLC d/b/a TIMESHARE EXIT TEAM ("TET"), is a timeshare exit company. Reed Hein & Associates, LLC is a limited liability company organized and existing under the laws of the state of Washington. The Washington Secretary of

State, Corporations Division lists a special address for TET of 906 W 2nd Avenue, Suite 100, Spokane, Washington 99201-4540.   On its website – www.timeshareexitteam.com – TET lists a "Corporate Office" located at 3400 188th Street SW, Suite 300, Lynwood, Washington 98037.  TET was registered with the Washington Secretary of State on or about December 31, 2012.

24.     The Washington Secretary of State lists two Governing Persons for TET: Brandon Reed and Trevor Hein.

25.     The Internet Corporation for Assigned Names and Numbers' ("ICANN") WHOIS database lists Scott Loughran ("Loughran") as the registrant, admin contact, and tech contact for www.timeshareexitteam.com.   TET's website lists "Scott L." as TET's marketing director.   That same webpage contains a hyperlink to a LinkedIn profile for a "Scott Loughran" who claims to be the Director of Marketing at ReedHein[sic] & Associates.

26.     Upon information and belief, Brandon Reed ("Reed") is an individual domiciled in King County, Washington and is a citizen of the state of Washington.

27.     Upon information and belief, Trevor Hein ("Hein") is an individual domiciled in Surrey, British Columbia, Canada and is a citizen of Canada.

28.     Upon information and belief, Loughran is an individual domiciled in Snohomish County, Washington and is a citizen of the state of Washington.

**Background and Factual Allegations Common to All Counts**

**A.     The Timeshare Purchase**

29.     Plaintiffs conduct timeshare sales, exchange, management, and development activities throughout the United States with a worldwide network of more than 420 vacation destinations in 35 countries. The Plaintiffs' timeshare resorts have been in operation for many years and they have developed a considerable base of owners who own timeshare interests at the Plaintiffs' various resorts.

30.     At the time consumers purchase timeshares from the Plaintiffs, they execute Contracts for Purchase and Sale (a "Purchase Agreement") wherein the purchaser agrees, *inter alia*, to pay maintenance fees to the Plaintiffs for the maintenance and upkeep of the timeshare units and common areas of the timeshare properties. In addition, the purchaser agrees to pay a pro-rated share of the property taxes to the Plaintiffs, which monies are then submitted by the Plaintiffs to the local tax collectors to satisfy tax obligations.

31.     If a purchaser desires mortgage financing, he or she may complete and submit a mortgage application; upon approval of financing, a purchaser will execute and deliver a Promissory Note and Mortgage in connection with the timeshare purchase. Both the Promissory Note and Mortgage are referenced and incorporated in the Purchase Agreement with the owners. US COLLECTION is the lender and holder of the Promissory Note and Mortgage.

32.     US COLLECTION is damaged by Defendants' tortious and illegal conduct. When the Defendants wrongfully convince Diamond Owners to breach their contracts with Plaintiffs, they cease making financing payments to US COLLECTION, thus negatively impacting US COLLECTION's revenue (and, though they are generally unaware it is occurring, the Diamond Owner's credit is negatively impacted as well).

33.     DRI is damaged by the Defendants' tortious and illegal conduct because Defendants' entire business model is premised on drawing customers away from DIAMOND, disparaging the Diamond brand, and making false statements about and to DIAMOND. Moreover, because the losses resulting from Defendants' tortious conduct are reflected on the DRI's financial statements, DRI ultimately suffers financial harm as a direct result of Defendants' illegal conduct.

**B.     The Diamond Brand**

34.     DRI, through its wholly owned subsidiary DRH, is the owner of the valuable Diamond® brand.  Over the past two decades, Plaintiffs have spent substantial amounts of money

marketing their brand to establish its wide-spread goodwill amongst consumers and foster its esteemed reputation throughout, *inter alia*, the hotel and resort, real estate sales management, and timeshare industries.

35.    Plaintiffs have developed the Diamond Marks (as defined herein below) to distinguish its products and services. Plaintiffs use the Diamond Marks in its advertising, marketing, and promotional endeavors. Plaintiffs have federal registrations for a number of marks, including the Diamond Marks listed below:

| Registration Number | Trademark | Registration Date | Description of Goods and/or Services |
|---|---|---|---|
| 2,411,329 | DIAMOND RESORTS INTERNATIONAL | December 5, 2000 | IC 042:  Hotel Services. |
| 2,432,190 | DIAMOND RESORTS INTERNATIONAL | February 27, 2001 | IC 036:  Real estate time sharing services. |
| 3,746,815 | DIAMOND RESORTS | February 9, 2010 | IC 036:  Real estate equity sharing, namely, managing and arranging for co-ownership of real estate; real estate time-sharing; vacation real estate time share exchange services; vacation real estate time-sharing. |
| 4,067,822 | DIAMOND LOYALTY | December 6, 2011 | IC 036:  Real estate equity sharing, namely, managing and arranging for co-ownership of real estate; real estate services, namely, rental of short term furnished apartments; real estate time-sharing; vacation real estate time sharing; vacation real estate time-sharing services. |

| | | | IC 038:  Providing free internet access; providing a dedicated web portal in the nature of providing access to interactive online chat room; providing dedicated reservation telephone lines for securing accommodations.

IC 043:  Travel services, namely, providing travel lodging information services and travel agency booking services for travelers; arranging for rooms in resorts, accommodation exchange and reservation services; making arrangements for travelers to extend lodging reservations, redeem unused lodging reservations, or to be allowed to waive redemption dates in connection with accommodation promotions.

IC 045:  Concierge services for others, comprising making requested personal arrangements and reservations and providing customer specific information to meet individual needs rendered together in a hotel and resort, apartment timeshare environment; providing customized gift baskets including bathroom amenities. |

| 4,101,489 | SHARE THE DIAMOND DIFFERENCE | February 21, 2012 | IC 036:  Real estate equity sharing, namely, managing and arranging for co-ownership of real estate; real estate time-sharing; vacation real estate time share exchange services; vacation real estate time-sharing; vacation real estate timeshare services. |
| 4,361,959 | DIAMOND RESORTS INTERNATIONAL | July 2, 2013 | IC 035:  Real estate sales management; managing and operating hotels of others. |
| 4,505,500 | DIAMOND LUXURY SELECTION | January 14, 2014 | IC 043:  Making reservations and bookings for others at hotels and residences; providing a website featuring information in the field of hotels and temporary accommodations for travelers; reserving lodging rooms for travelers. |
| 4,805,164 | DIAMOND PLUS POINTS | September 1, 2015 | IC 035:  Incentive programs for credit card users, namely, providing gift cards, merchandise, and travel awards for credit card use as part of a customer loyalty program.<br><br>IC 036:  Credit card services; incentive programs for credit card users, namely, providing cash and rebates for credit card use as part of a customer loyalty program. |

(collectively the "Diamond Marks"). True and correct copies of the Certificates of Registration for the Diamond Marks, and associated assignments to DRH (as appropriate), are attached hereto as Composite Exhibit 1.

36.     The Diamond Marks are in full force and effect and have never been revoked or cancelled. Many of the Diamond Marks have become incontestable.

37.     Plaintiffs have provided notice to the public of the registrations and ownership of the Diamond Marks by including same on general promotional, advertising, legal and other documents and materials. Additionally, by virtue of registration on the Principal Register, DRI has provided constructive notice of its claim of ownership of the Diamond Marks. Upon information and belief, Defendant has actual knowledge of the registration, and DRI's ownership, of the Diamond Marks.

38.     The federally protected Diamond Marks have become associated with a well-regarded hotel and resort, real estate sales management, and timeshare brand and have otherwise become famous.

C.     **The Defendants and Their Business**

39.     Upon information and belief, in or around late December, 2012, TET was formed by Reed and Hein to solicit timeshare owners using false and misleading advertising with, among others, the purpose of tortious interference with Plaintiffs' existing contracts and advantageous business relationships with its owners.

40.     TET is a "timeshare exit business." The goal of a timeshare exit business is to solicit owners of timeshare interests (including Diamond Owners), convince those owners that they want to terminate their timeshare contracts (frequently through improper means, though this is rarely disclosed to the consumer), and entice those owners into signing a contract with the timeshare exit business, requiring payment up-front. Upon information and belief, the owners of the timeshare

13

interests (including Diamond Owners) may not desire to breach their valid timeshare contracts but for the fraudulent inducements offered by TET.

41.   TET uses a variety of methods to acquire potential customers (such as Diamond Owners).  Some of these marketing methods include being endorsed by television personalities and motivational speakers' websites, advertising through radio stations across the country, appearing in newspaper articles (such as in the Los Angeles Times and USA Today), engaging in television advertising, and utilizing at least three discreet websites: www.timeshareexitteam.com, www.reedhein.com, and www.321exit.com (collectively the "TET Domains").  The domain names www.reedhein.com and www.321exit.com both redirect customers to one of the pages hosted at www.timeshareexitteam.com.  At least some of these websites list Loughran as the owner thereof.

42.   Defendants also utilize social media, such as Facebook, and other internet websites and forums for marketing purposes and to induce potential customers (including Diamond Owners) into contacting TET.  An individual claiming to be TET's marketing director (i.e., Loughran) has interacted with individuals on a variety of websites and forums, responding to criticism leveled against TET and attempting to defend against consumer allegations of fraud or other unsavory acts allegedly committed by TET.

43.   The TET Domains promise that potential customers (such as Diamond Owners) can exit their timeshare, safely, legitimately, and forever, and alleges that TET "work[s] with timeshare companies to exit your timeshare."  TET claims to back this promise with a 100% money back guarantee, though a close reading of TET's disclaimers reveals that this alleged guarantee is not as good as it seems.

44.   TET's misleading advertising and marketing are designed to induce Diamond Owners into breaching their timeshare contracts with Diamond.  However, TET fails to disclose how, exactly, TET will enable its customers to "exit" their timeshare contracts.  How TET will

14

accomplish that is not publicly disclosed; TET only refers to an "exit process" that TET claims is "proprietary." TET states that this "proprietary" process is unique to every case.

45. Upon information and belief, TET does not publicly disclose the fees it charges timeshare owners; when asked about fees charged, TET's normal response is, once again, to state that every case is unique and that a private consultation with TET is the only way to obtain a fee quote. The Los Angeles Times reported on this behavior. According to that article, after it was published, TET provided a statement regarding their "average" fee, but TET continues to refuse to provide fee information unless a consumer has a "free consultation" with TET.

46. Consumers, including Diamond Owners, are left with little idea as to what TET will do for them (other than allow them to exit their timeshare contract) or how TET will accomplish that task, without agreeing to be submitted to what is, upon information and belief, a high-pressure sales meeting. Timeshare owners that contact TET may not be predisposed to exit their timeshare when they contact TET and may only be seeking information that TET refuses to publicly disclose.

47. Upon information and belief, the free consultation (in reality, sales pitch) may be either in person with TET or its employees or agents, or virtually via a webinar, internet presentation, or other teleconferencing method.

48. At the free consultation, TET (or its employees or agents) collects certain information from the prospective customer at the sales pitch meeting. An example of the information collected is annexed hereto as Exhibit 2.

**D.   Defendants' Scheme, Generally**

49. Upon information and belief, utilizing the information collected from the potential customer, TET prepares a worksheet designed to sell the potential customer on hiring TET. An example of this worksheet is annexed hereto as Exhibit 3. This worksheet is misleading. In order to induce timeshare owners, including Diamond Owners, into signing a contract with TET, TET

presents the potential customer with two calculations: total maintenance fees plus special assessments plus mortgage payments (if any) called for by the remainder of the timeshare owner's timeshare contract, and the fee TET will charge the potential customer for TET's "proprietary process." By failing to discount the payments expected over the remainder of the timeshare contract to net present value, TET willfully exaggerates what the timeshare owner may pay, making TET's fees seem relatively lower in comparison to what they really are.

50.    The fees charged by timeshare exit businesses vary but are typically in the many thousands of dollars per customer. These fees are so high that some timeshare exit businesses, including TET, offer financing plans to timeshare owners (including Diamond Owners) to further induce the timeshare owner to retain TET to breach their timeshare contract.

51.    Thus, at this point, TET has actively solicited timeshare owners, including Diamond Owners, to call or visit TET's website, refused to provide any substantive information until those timeshare owners agree to an in-person or virtual consultation which is, in actuality, a high pressure sales pitch, and presented the timeshare owner with a misleading financial calculation and deceptive guarantee. Upon information and belief, all of the foregoing is done to induce timeshare owners, including Diamond Owners, to retain TET to assist the timeshare owners in breaching their timeshare agreements and to create the appearance of possible affiliation, sponsorship, endorsement, or approval by and between TET and DIAMOND.

52.    If a timeshare owner decides to utilize TET, TET presents the timeshare owner with at least two (and sometimes more) different documents: a contract, a copy of which is annexed hereto as Exhibit 4, and worksheet titled "Things to Remember," a copy of which is annexed hereto as Exhibit 5. Upon information and belief, even when providing the aforementioned documents, TET still does not tell timeshare owners, including Diamond Owners, what, exactly, TET is going to do in order to fulfill the promises made by TET.

16

53.     What TET actually does in many instances is intentionally prohibit communication between DIAMOND and the Diamond Owners who have retained TET, cause those Diamond Owners to default on their payment obligations under the timeshare contract causing DIAMOND to foreclose on that interest (damaging the credit of the Diamond Owner), and then claim that TET has "exited" the timeshare owner from their timeshare contract.  All of the foregoing is done without the knowledge of the timeshare owner and falls within the loopholes of TET's money-back "guarantee."

54.     The Things to Remember worksheet, which requires the timeshare owner, including Diamond Owners, to initial next to every "point to remember," actually makes the situation even murkier.  This worksheet contains a number of provisions designed to prevent the timeshare owner from discovering that their account remains active, they remain obligated to pay, and that TET did not obtain the "guaranteed" timeshare exit agreement.  More importantly the provisions are designed to prevent DIAMOND from communicating with its members about their contractual obligations.  Some of these points include directing the timeshare owner not to: contact the timeshare company because any contact will slow down the process (Ex. 5, ¶ 2), talk with anyone from the timeshare company or any collection agency (*Id.* at ¶ 4), and contact any attorney working on the file, instead directing all contact to TET (*Id.* at ¶ 9).

55.     While the Things to Remember worksheet informs the timeshare owner that they need to pay all fees when they come due, in actuality, TET verbally instructs the timeshare owner not to make any payments.

56.     The worksheet also requires the timeshare owner to acknowledge that "the last thing most of the timeshare companies want is to release documentation that **admits** their agreement to let you out of your contract.  Like we said before, we will get you a copy of such agreement if we can, but regardless if we are able to, we will give you an official notification from us that you have been

17

1   released." *Id.* at ¶ 5 (emphasis in original). TET makes this statement as if settlements cannot be

2   kept confidential.

3
    57.     Upon information and belief, while the foregoing points may seem highly unusual to
4
    trained attorneys, the general consuming public may not be aware that a prohibition from contacting
5
    their own attorney is extremely unusual and that things like confidential settlement agreements exist.
6

7   **E.    How Defendants Execute their Scheme**

8       58.     TET utilizes attorneys to execute its "proprietary process." These attorneys are

9   retained directly by Defendants pursuant to bulk representation contracts wherein Defendants

10  promise to send the attorneys a minimum number of files per month and pay a fixed fee per file.

11  The attorneys represent TET and not the timeshare owners. Upon information and belief, this
12
    arrangement may amount to illegal or unethical fee splitting or sharing.
13

14      59.     TET's attorney contacts a timeshare company, such as DIAMOND, purportedly on

15  behalf of the timeshare owner (who is not actually the attorneys' client), to make vague statements

16  that the timeshare owner has concerns that they are willing to accept a reasonable offer to settle and

17  that the timeshare company is not to contact the timeshare owner.

18
        60.     Thus, once the aforementioned letter is sent, TET has effectively isolated the
19
    timeshare owner from the timeshare company. TET has directed its client (the timeshare owner)
20
    not to have any contact with the timeshare company, TET's attorney – misrepresenting him or
21
22  herself as representing the timeshare owner – has directed the timeshare company not to contact the

23  timeshare owner, and TET has directed its client not to contact the attorney. Because the attorney

24  will not speak with the timeshare owner, TET has ensured that TET controls all information and the

25  timeshare owner – which is TET's client – receives only the information TET decides to provide.

26
        61.     This isolation is purposeful. Despite any language in any agreement to the contrary,
27
    TET directs its timeshare owner clients not to pay maintenance or other fees on their timeshare
28

18

contracts. Alternatively, TET tells timeshare owners that TET will reimburse the timeshare owners for any fees they must pay to the timeshare company but then fails to make the promised payment.

62.     Upon information and belief, TET engages in this course of action so that, at the very least, if negotiations or other means are unsuccessful, the timeshare owner's failure to make required payments results in the timeshare company defaulting the timeshare owner and either foreclosing on the timeshare contract or receiving an offer of a deed-in-lieu of foreclosure. This happens without the timeshare owner's knowledge because TET or its attorneys have directed the timeshare company not to contact the timeshare owner and directed the timeshare owner not to have contact with the timeshare company. The timeshare owner's only knowledge of a default happens when they realize the default has been reported to various credit reporting agencies, adversely affecting the timeshare owner's credit rating.

## F.    Defendants' Scheme, a Specific Example

63.     A specific example of how Defendants' scheme works may be useful in understanding its operation. The following specific incident is presented for illustrative purposes and is in no way limiting.

64.     On November 6, 2017, DIAMOND received a Consumer Complaint from the Consumer Protection Division of the Attorney General's Office of the state of Washington. A copy of this complaint and correspondence is annexed hereto as Exhibit 6.

65.     The Consumer Complaint was filed by Ms. P.A., a Diamond Owner and TET client.

66.     Ms. P.A. entered into a contract with TET on or about August 21, 2015. She contacted TET off of a referral from motivational speaker Dave Ramsey's website. Ex. 6 at p. 16. Ms. P.A. (together with J.A.) signed a Timeshare Owner Exit Agreement with TET. *Id.* at pp. 20-23.

19

67. The Timeshare Owner Exit Agreement states, in part:

Please remember that you own your Timeshare until the closing of the exit is finalized, thereby relieving you of ownership; and you remain responsible for all financial obligations associated with your Timeshare until the exit is completed. The closing of an exit transaction usually takes 3 to 9 months, but in some cases longer due to Resort delays or restrictions.

*Id.* at p. 21. Despite this language, TET actually told Ms. P.A. not to make any further payments to DIAMOND.

68. On October 8, 2015, the Law Offices of Mitchell Reed Sussman & Associates sent a letter to DRI. A copy of this letter is annexed hereto as Exhibit 7. The October 8 letter was received by DRI on or about October 16, 2015.

69. In the October 8 letter, the Law Offices of Mitchell Reed Sussman & Associates claims to represent J.A. and P.A., threatens DRI with allegations of misrepresentation and fraud, states that J.A. and P.A. are providing their notice of resignation from the vacation club "consistent with Sections 613 and 620 of the provisions of the Model Non-Profit Corporation Act as Amended in 2008" and citing Supreme Court law (in employment union cases) in support thereof, demanding that "pursuant to my client's[1] request, please forward all future communications" to the law firm, and citing the Federal Fair Debt Collection Practices Act to notify DIAMOND that it shall "not contact by phone, mail or initiate any communication with my client . . . ."

70. The October 8 letter also states that "[P.A. and J.A.] will no longer be making any payments on the time – share including any future or past due maintenance assessments." Ex. 7, p. 1.

71. Additionally, the October 8 letter states that "my client" is "prepared to execute a 'deed in lieu' of foreclosure by which he will deed the property back to you without you having to incur the expense of a drawn out foreclosure proceeding."

---

[1] Ostensibly the J.A. and P.A., in reality TET.

20

72.     Upon information and belief, Ms. P.A. was never informed that TET's "proprietary process" was to force her timeshare interest into foreclosure. Further, upon information and belief, Ms. P.A. never retained Mitchell Reed Sussman & Associates.

73.     DIAMOND received one phone call regarding this issue from the Mitchell Reed firm and then heard nothing further. DIAMOND proceeded to foreclose on Ms. P.A.'s timeshare interest.

74.     On September 5, 2017 – more than two years after signing the contract with TET – Ms. P.A. sent an email to TET. This email is part of a chain of emails that started in July 2017, when TET asked Ms. P.A. whether she had brought her account with DIAMOND current. On September 5, P.A. stated, *inter alia*, that,

> Third, when I was verbally told that I would need to bring the maintenance fees current in order to proceed with the exit, I expressed some serious concern. My husband and I had always kept our fees current. However, when we retained services through ReedHein, under the direction of Reed Hein and with great concerned [sic] expressed at that time, we stopped paying those fees.

Ex. 6 at p. 13.

75.     In response, TET sent a lengthy email to Ms. P.A. that, *inter alia*, explains that there are additional fees she must pay to transfer her timeshare interest, that "Standard Timeshare Transfers is in the process of preparing transfer documents," and that

> In regards to your maintenance fees, it may have been suggested to stop paying your maintenance fees . . . We do acknowledge the suggestion of non-payment, which is why we are offering to cover late fees and interest that may have accrued on the account. I do see that Osman acknowledged this offer in a note in your file. How this would work is, you would reach out and come completely current on your payments with the timeshare so that your account carries a zero dollar account balance. You would then request that Diamond send you a statement showing the breakdown of all your fees, showing specifically what the late fees and interest may have been and that you brought the account current. That information would then need to be provided to Reedhein so that we could see how much the late fees and interest amounted to, and have this approved for reimbursement.

Ex. 6 at p. 15.

76.     Ms. P.A. is not the only person who has been induced into breaching a timeshare contract with DIAMOND.   There are numerous consumer complaints on the internet alleging TET engaged in the scheme outlined above.

77.     Defendants thus wrongly induce timeshare owners, including Diamond Owners, into breaching their timeshare agreements with Plaintiffs.

78.     In the course of carrying out their scheme outlined above, Defendants utilize at least some of the Diamond Marks, make various disparaging statements about Plaintiffs, and create the impression that there is some sort of endorsement, sponsorship, or affiliation between Defendants and Plaintiffs.   The statements include statements that DIAMOND unfairly charges fees to timeshare owners, that DIAMOND lies to timeshare owners, and that DIAMOND hides information from timeshare owners.

79.     Defendants intentionally and unjustifiably interfered with Plaintiffs' contractual and advantageous business relationships with the Diamond Owners by advising them to terminate their contractual relationships without any valid grounds, in exchange for a fee and the false assurance that there will be no liability because TET is involved.

80.     Plaintiffs have not engaged in any behavior which would justify the cancellation of any of the contractual obligations by the Diamond Owners.

81.     As a direct and proximate result of the Defendants' intentional and unjustified interference with Plaintiffs' contractual relationships with the Diamond Owners, Plaintiffs have been damaged.

82.     All conditions precedent to the filing of this action have been satisfied, waived, or have occurred.

83.     In addition, Plaintiffs have retained the law firms of Shutts & Bowen LLP and Cooper Levenson, P.A. to represent them in this action and are obligated to pay reasonable attorney's

fees and costs incurred herein. (The attorneys from Shutts & Bowen LLP listed on the cover of this complaint will be applying for admission to this district *pro hac vice* forthwith.)

## COUNT I

### (INTENTIONAL INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS)

84. Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 83 above as if more fully set forth herein.

85. This is a cause of action for tortious interference with existing contracts and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

86. Plaintiffs have valid and legally enforceable contracts with Diamond Owners for their timeshare units.

87. Defendants have knowledge of those relationships. The very fact that Plaintiffs have a business relationship with the Diamond Owners is the basis under which Defendants sought to establish a relationship with the Diamond Owners.

88. Defendants solicited the Diamond Owners with the intention of inducing or causing them to breach their contracts with Plaintiffs.

89. Defendants' willful actions to help parties with whom Plaintiffs have valid contractual agreements breach their agreements constitute intentional interference with existing contracts.

90. Defendants have intentionally and without justification or privilege interfered with Plaintiffs' existing contracts by convincing Diamond Owners to immediately stop making any further payments under their contracts without any legal basis.

91. Defendants' actions were not made in good faith, but rather were made with the knowledge and purpose to injure Plaintiffs or with reckless disregard for the attendant consequences

1   naturally, directly, and proximately resulting from Defendants' actions and without reasonable

2   grounds for Defendants to believe that their actions were justified and proper.

3       92.    As a direct and proximate result of Defendants' intentional misconduct, Diamond

4   Owners have terminated, or have sought to terminate, their contractual relationship with Plaintiffs

5   before the expiration of the terms of those contracts.

6

7       93.    Defendants have no justification or privilege in procuring the breach of such

8   contracts.

9       94.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

10                                  **COUNT II**

11                 **(INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS BUSINESS**
12                 **RELATIONSHIPS/PROSPECTIVE ECONOMIC ADVANTAGE)**

13      95.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through

14   83 above as if more fully set forth herein.

15      96.    This is a cause of action for tortious interference with advantageous business

16   relationships and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and
17
18   costs, and is within this Court's jurisdiction.

19      97.    Plaintiffs have advantageous business relationships with the Diamond Owners.

20      98.    Defendants have knowledge of those relationships. The very fact that Plaintiffs have a

21   business relationship with the Diamond Owners is the basis under which Defendants sought to

22   establish a relationship with the Diamond Owners.

23      99.    Defendants have successfully solicited Diamond Owners wishing to terminate their
24
25   contracts with Plaintiffs.

26      100.   As stated above, Defendants have intentionally and without justification interfered

27   with Plaintiffs' relationships by convincing Diamond Owners to immediately stop making any

28   further payments under their contracts without any legal basis.

101.    Defendants' actions were not made in good faith, but rather were made with the knowledge and purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

102.    As a direct and proximate result of Defendants' intentional misconduct, Diamond Owners have terminated, or have sought to terminate, their contractual relationship with Plaintiffs before the expiration of the terms of those contracts.

103.    Defendants had no justification or privilege in procuring the breach of such business relationships.

104.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

## COUNT III

### (VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1))

105.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 83 above as if more fully set forth herein.

106.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

107.    Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead Diamond Owners. The statements described above and incorporated herein were literally false, either on their face or by necessary implication.

108.    The representations described above were commercial speech made by a defendant acting in competition to Plaintiffs by trying to interfere with Plaintiffs' business relationships for Defendants' own ill-gotten financial gain, for the purpose of influencing Diamond Owners to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

109.    Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of Diamond Owners.

110.    Defendants' deception is material, in that it is likely to influence the Diamond Owners' decision whether to retain Defendants' services or to cease making payments to Plaintiffs.

111.    Plaintiffs have been and are likely to be injured as a result of Defendants' false statements.

112.    Plaintiffs demand both injunctive and monetary relief as set forth by the Lanham Act. *See* 15 U.S.C. §§ 1116 – 1117.

## COUNT IV

### (FALSE ADVERTISING UNDER THE LANHAM ACT)

113.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 83 above as if more fully set forth herein.

114.    Defendants have made false statements of fact about both Diamond and themselves. Amongst other statements, Defendants have falsely stated that Diamond will not work with Diamond Customers should any of those Diamond Customers wish to exit their timeshare contracts and Defendants have falsely stated and/or implied that they use some special method to assist Diamond Customers in exiting their timeshare contracts. None of the foregoing statements are true.

115.    The false statements made or implied by Defendants have the tendency to deceive the consuming public.

116.    The false statements made or implied by Defendants are material and likely to influence the purchasing decisions of the consuming public, specifically Diamond Customers.

117.    Defendants have placed their statements in interstate commerce by distributing the statements actively on their websites and through other national media outlets, such as television and radio.

118.    Plaintiffs are likely to be injured as a result of the false statements made or implied by Defendants through both the direct diversion of Diamond Customers away from Plaintiffs and to Defendants, and through the lessening of the goodwill associated with Plaintiffs' goods and services.

## COUNT V

### (VIOLATION OF NEVADA'S DECEPTIVE
### TRADE PRACTICES ACT, Nev. Rev. Stat. §598, 598A, 41.600, et seq.)

119.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 83 above as if more fully set forth herein.

120.    This is a cause of action for violations of the Nevada Deceptive and Unfair Trade Practices Act, Nev. Stat. §598 and §598A, et seq. against Defendants, including unconscionable acts and practices and unfair and deceptive practices in the conduct of trade or commerce.

121.    Defendants are engaged in "trade or commerce" as defined by Nev. Rev. Stat. Section 598A.020.

122.    Defendants have engaged in the following unconscionable, unfair, and deceptive acts or practices: failing to disclose to timeshare owners how Defendants will get timeshare owners out of their timeshare contracts, isolating the timeshare owner from the timeshare company, inducing the timeshare owner to breach their timeshare contract resulting in negative consequences for the timeshare owner (such as adverse credit reports), representing to the timeshare owner that they would have a lawyer when, in reality, the lawyer works for TET, and failing to inform the timeshare owner of the foregoing.  In so doing, Defendants make false or misleading representations of tact to Diamond Customers.

123.    Plaintiffs have suffered substantial harm as a direct and proximate cause of Defendants' deceptive, misleading, and unfair practices as they wrongly induce Diamond Owners into breaching timeshare contracts with Plaintiffs when the timeshare owner did not know they were being induced into breaching the timeshare contract.

124.    Defendants' unconscionable and deceptive acts and practices are likely to continue and will cause damage to Plaintiffs because they are currently soliciting Plaintiffs' timeshare owners through false and misleading advertisements and convincing them to immediately terminate their contractual obligations with Plaintiffs. Additionally, they have lulled Diamond Owners into a sense of complacency by informing them that TET is handling the file and guaranteeing results.

125.    Pursuant to Nev. Rev. Stat. §§598, 598A, 41.600, Plaintiffs are entitled to damages, attorney's fees, and costs.

126.    Plaintiffs reserve the right to seek punitive damages under Nevada law.

## COUNT VI

### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF)

127.    Plaintiffs reallege and reincorporate the allegations contained in paragraphs 1 through 83 above as if more fully set forth herein.

128.    This is a cause of action for temporary and permanent injunctive relief and is within this Court's jurisdiction.

129.    Defendants' solicitation of Diamond Owners using false and misleading advertising and their subsequent instruction to immediately terminate the Diamond Owners' contracts with Plaintiffs is harming Plaintiffs and constitutes tortious interference with Plaintiffs' existing contractual and advantageous business relationships.

130.    Defendants have engaged, continue to engage, and/or intend to further engage in the conduct described above.

131.    Defendants' actions present an immediate threat of irreparable harm to Plaintiffs, and Plaintiffs will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives, and employees, are not enjoined from this conduct.

132.   The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Diamond Owners using the false and misleading advertising outlined above; and then convince the Diamond Owners to immediately stop paying all mortgage, maintenance, and tax payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation.

133.   Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this activity. Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance and tax payments owed to them and will be forced to expend monies foreclosing on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

134.   There is a substantial likelihood that Plaintiffs will prevail on the merits of their claims against Defendants.

135.   The injury and potential harm caused by Defendants' intentional inference with Plaintiffs' advantageous business relationships outweigh the harm, if any, that an injunction would cause to Defendants.

136.   The issuance of the requested injunction will serve the public interest by protecting Plaintiffs' legitimate business interests and their timeshare owners, and by restraining the disruptive and tortious actions committed by Defendants.

### **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendants for:

(a)   compensatory damages in an amount that exceeds $75,000.00;

(b)   special damages;

(c)   punitive damages;

(d)     pre- and post-judgment interest;

(e)     attorneys' fees;

(f)     costs;

(g)     a temporary and permanent injunction entered against Defendants and their agents, representatives, employees, affiliates, and any others acting in concert or participating with Defendants, and prohibiting Defendants from: (1) publishing false and misleading misrepresentations on their website or in any other electronic or print media or materials regarding Plaintiffs' owners' cancellation of their timeshare interest without any legal basis; and (2) contacting and/or otherwise interfering with Plaintiffs' contractual and business relationships with their owners;

(h)     their costs and attorney's fees pursuant to Nev. Rev. Stat. §41.600 and/or 15 U.S.C. § 1117; and

(i)     such additional and further relief this Court deems just and proper.

DATED this 6ᵗʰ day of December, 2017.

COOPER LEVENSON, P.A.

SHUTTS & BOWEN, LLP

**KIMBERLY MAXON-RUSHTON**
**Nevada Bar No. 5065**
**R. SCOTT RASMUSSEN**
**Nevada Bar No. 6100**
**1835 Village Center Circle**
**Las Vegas, Nevada 89134**

**and**

**ALFRED J. BENNINGTON, JR., ESQ.**
**Florida Bar No. 404985**
(*Pro hac vice* **to be filed**)
**GLENNYS ORTEGA RUBIN, ESQ.**
**Florida Bar No. 556361**
(*Pro hac vice* **to be filed**)
**SHUTTS & BOWEN LLP**
**300 South Orange Avenue, Suite 1000**
**Orlando, Florida 32801**

30

and

DANIEL J. BARSKY, ESQ.
Florida Bar No. 25713
(*Pro hac vice* to be filed)
SHUTTS & BOWEN LLP
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131


*Attorneys for Plaintiffs*